1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

8

EASTERN DISTRICT OF CALIFORNIA

9

10   MANUEL CONTRERAS,                        1:10-CV-01907 OWW SMS HC

11                    Petitioner,            FINDINGS AND RECOMMENDATION
                                             REGARDING PETITION FOR WRIT OF
12         v.                                HABEAS CORPUS

13
     JAMES A. YATES, Warden,
14
                     Respondent.
15   _____/

16
            Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
17
     pursuant to 28 U.S.C. § 2254.
18
                               **PROCEDURAL BACKGROUND**[1]
19
            Petitioner is currently in the custody of the California Department of Corrections pursuant to
20
     a judgment of the Superior Court of California, County of Tulare, following his conviction by jury
21
     trial on October 5, 2006, of: three counts of conspiracy to commit murder (Cal. Penal Code[2] §§ 182,
22
     187); two counts of mayhem (§ 203); one count of permitting another to shoot from a vehicle
23
     (§ 12034(b)); and three counts of assault with a firearm (§ 245(a)(2)).  Gang and firearm
24
     enhancements were found to be true.  On November 3, 2006, he was sentenced to a total
25

26   ─────────────────
           [1]This information is derived from the pleadings in this case and the state court records lodged by Respondent with
27   his response.

28         [2]All further statutory references are to the California Penal Code unless otherwise noted.

1   indeterminate term of 145 years to life.

2          Petitioner appealed to the California Court of Appeals, Fifth Appellate District (hereinafter

3   "Fifth DCA"). On April 18, 2008, the Fifth DCA modified the judgment to reflect only a single

4   conviction of conspiracy to commit murder.  The matter was remanded to the superior court for

5   resentencing.

6          On August 4, 2008, the superior court resentenced Petitioner to a total indeterminate term of

7   50 years to life.  Petitioner again appealed to the Fifth DCA whereupon judgment was affirmed in a

8   reasoned decision.  Petitioner then petitioned for review in the California Supreme Court.  The

9   petition was summarily denied on November 10, 2009.

10         Petitioner filed the instant federal habeas petition in this Court on October 13, 2010.  He

11  claims his sentence constitutes cruel and unusual punishment under the Eighth Amendment to the

12  Constitution.  On January 25, 2011, Respondent filed an answer to the petition.  Petitioner did not

13  file a traverse.

14                         **FACTUAL BACKGROUND**[3]

15         After someone shot at defendant's family residence, defendant and other Sureno street
       gang members concluded members of the rival Norteno gang were responsible. At
16     defendant's request, Pablo Salazar, another Sureno gang member, obtained a sawed-off
       shotgun and brought it to defendant's house, where gang members passed it around; on
17     October 31, 2003, they discussed getting "payback" for the shooting by stealing a car, finding
       Nortenos, and shooting at them. That night, defendant borrowed a truck from codefendant
18     Lucio Delgadillo; with codefendants Salazar and Alberto Corona as passengers, defendant
       drove past a house where a Halloween party was taking place. They thought they recognized
19     Nortenos among the partygoers; after driving by the house a couple more times, Salazar fired
       the shotgun at a group of people standing close together outside the house. Javier Espindola
20     was struck in the face and permanently blinded in both eyes; Lorenzo Ruiz was struck in the
       face and permanently blinded in one eye; Edward Alonzo was struck in the shoulder.
21     Defendant fled to Mexico; he returned 15 months later and voluntarily surrendered to police.

22  (See Resp't's Answer Ex. B.)

23                             **DISCUSSION**

24  I.     Jurisdiction

25         Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

26  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

27  ─────────────────

28         [3]The factual background is taken from the opinion of the state appellate court and is presumed correct. 28
    U.S.C. § 2254(e)(1).

1   the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

2   375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

3   Constitution.  The challenged conviction arises out of Tulare County Superior Court, which is

4   located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

5           On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

6   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

7   Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert.*

8   *denied,* 522 U.S. 1008 (1997), *quoting,* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

9   *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh, 521 U.S. 320 (holding AEDPA

10  only applicable to cases filed after statute's enactment).  The instant petition was filed after the

11  enactment of the AEDPA and is therefore governed by its provisions.

12  II.      Standard of Review

13          The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

14  Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

15  (2003).  Under the AEDPA, a petitioner can prevail only if he can show that the state court's

16  adjudication of his claim:

17          (1) resulted in a decision that was contrary to, or involved an unreasonable application
            of, clearly established Federal law, as determined by the Supreme Court of the United
18          States; or

19          (2) resulted in a decision that was based on an unreasonable determination of the facts
            in light of the evidence presented in the State court proceeding.
20

21  28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

22          As a threshold matter, this Court must "first decide what constitutes 'clearly established

23  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

    *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court
24
    must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time
25
    of the relevant state-court decision."  Id., *quoting* Williams, 592 U.S. at 412; see also Harrington v.
26
    Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011). "In other words, 'clearly established Federal law'
27
    under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at
28

1   the time the state court renders its decision." Lockyer, 538 U.S. at 71.

2       Finally, this Court must consider whether the state court's decision was "contrary to, or

3   involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

4   quoting, 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant

5   the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

6   question of law or if the state court decides a case differently than [the] Court has on a set of

7   materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

8   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

9   court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

10  applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

11      "[A] federal court may not issue the writ simply because the court concludes in its

12  independent judgment that the relevant state court decision applied clearly established federal law

13  erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also

14  Harrington, 131 S.Ct. at 785.  A federal habeas court making the "unreasonable application" inquiry

15  should ask whether the state court's application of clearly established federal law was "objectively

16  unreasonable." Williams, 529 U.S. at 409.  "A state court's determination that a claim lacks merit

17  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the

18  state court's decision." Harrington, 131 S.Ct. at 786, quoting, Yarborough v. Alvarado, 541 U.S.

19  652, 664 (2004).  Further, "it is not an unreasonable application of clearly established Federal law for

20  a state court to decline to apply a specific legal rule that has not been squarely established by this

21  Court." Knowles v. Mirzayance, 556 U.S. __, __, 129 S.Ct. 1411, 1413-14 (2009).  "Under 2254(d),

22  a habeas court must determine what arguments or theories supported or, . . . could have supported,

23  the state court's decision; and then it must ask whether it is possible fairminded jurists could

24  disagree that those arguments or theories are inconsistent with the holding of a prior decision of [the

25  Supreme] Court." Harrington, 131 S.Ct. at 786.  Only "where there is no possibility fairminded

26  jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents"

27  may the writ issue. Id.

28      Petitioner has the burden of establishing that the decision of the state court is contrary to or

1  involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>,

2  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

3  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

4  decision is objectively unreasonable.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th

5  Cir.1999).

6      AEDPA requires that we give considerable deference to state court decisions. "Factual

7  determinations by state courts are presumed correct absent clear and convincing evidence to the

8  contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a

9  factual determination will not be overturned on factual grounds unless objectively unreasonable in

10  light of the evidence presented in the state court proceedings, § 2254(d)(2)." <u>Miller-El v. Cockrell</u>,

11  537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of

12  historical or pure fact, not mixed questions of fact and law.  <u>See</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943,

13  976-77 (2004).

14  III.    <u>Review of Claim</u>

15      Petitioner contends the sentence imposed was cruel and unusual punishment under the Eighth

16  Amendment.  He states he was young at the time of the offense and had only a minimal criminal

17  record.  He contends the sentence he received for his minor role as a driver was grossly

18  disproportionate to the sentences received by his codefendants.  Respondent argues the state court

19  reasonably rejected Petitioner's claim.

20      This claim was presented on direct appeal to the Fifth DCA where it was rejected in a

21  reasoned decision.  Petitioner then presented the claim in a petition for review to the California

22  Supreme Court where it was summarily rejected.  When the California Supreme Court's opinion is

23  summary in nature, the Court must "look through" that decision to the court below that has issued a

24  reasoned opinion.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the

25  appellate decision was the last reasoned decision.  The appellate court denied the claim as follows:

26          The Eighth Amendment to the United States Constitution prohibits *cruel and unusual*
    *punishments.* It prohibits "'only extreme sentences that are "grossly disproportionate" to the
27    crime.'" (*Ewing v. California* (2003) 538 U.S. 11, 23 (lead opn. of O'Connor, J.).) The
    California Constitution proscribes "cruel or unusual punishment." (Cal. Const., art. I, § 17.)
28    This prohibition may be violated if a punishment is "'so disproportionate to the crime for

which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136.) "Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496 (*Martinez* ).)

In determining whether a punishment is cruel or unusual, the court must consider the nature of both the offense and the offender. (*Martinez, supra,* 76 Cal.App.4th at pp. 493-494.) "'To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1426-1427.) The court must give great deference to the penalty prescribed by the Legislature; the Legislature "is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches." (*Martinez, supra,* 76 Cal.App.4th at p. 494.) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*Ibid.;* see also *Lockyer v. Andrade* (2003) 538 U.S. 63, 73 ["the gross disproportionality principle ... [is] applicable only in the 'exceedingly rare' and 'extreme' case"].)

We consider the circumstances of the offense. The motive for defendant's offense was revenge. Defendant and his fellow gang members wished to pay back unknown persons who had shot at defendant's residence by randomly shooting at those they believed to be rival gang members. Defendant was heavily involved in planning and carrying out the offense. He asked Salazar to obtain a gun, which Salazar did; he discussed with other Surenos how they would pay back the Nortenos they believed had shot at his house. He borrowed a truck from Delgadillo and drove it past the Halloween party more than once, with Salazar, armed with the shotgun, as a passenger. Without warning or provocation, Salazar shot at people attending a Halloween party. Two suffered permanent, disabling injuries; a third suffered a more minor injury.

As to the personal characteristics of defendant, the probation report indicates that at the time of the offense, defendant was five days short of his 19th birthday. He had been involved in gangs since seventh grade. He began using alcohol and marijuana at age 12 and methamphetamine at age 14. He had an 11th grade education and was employed for an orchard spraying company. Defendant had previously been placed on juvenile probation for burglary and being under the influence of a controlled substance; he violated that probation and was placed in a residential drug treatment program that he failed to complete. He fled to Mexico after the offense, but returned and surrendered to law enforcement 15 months later.

We do not find this to be one of those rare cases in which the punishment was grossly disproportionate to the crime of which defendant was convicted. Defendant was convicted of conspiracy to commit murder and three counts of attempted murder, among other offenses. Defendant actively participated in the planning and execution of the offenses. He had a long-term gang affiliation, which was a major factor in the commission of the crimes. His conduct posed a serious danger of death or great bodily injury to innocent bystanders as well as rival gang members.

Defendant contends the facts of his case are similar to those in *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*), where the court found that punishing defendant for first degree felony murder under the circumstances of that case amounted to cruel and unusual punishment. In *Dillon,* the defendant was a 17-year-old high school student. After learning Dennis Johnson and his brother were growing marijuana on their farm, Dillon and two

companions went to investigate and try to take some of the marijuana. While they were there, Johnson approached them with a shotgun; he told them to get off the property and warned them that if they returned, he might shoot them. (*Id.* at p. 451.) Dillon subsequently recruited several classmates and planned to "'rip off' "the marijuana; the boys considered various ways of dealing with Johnson, and Dillon suggested they "'[h]it him over the head or something. Tie him to a tree.'" (*Ibid.*) Dillon made a map of the farm; he and seven classmates armed themselves-Dillon with a .22-caliber semi automatic rifle, the others with shotguns, a baseball bat, and a knife-and took tools for harvesting the marijuana. They split into four pairs and approached the farm. (*Ibid.*) One of Dillon's companions accidentally discharged his shotgun twice. (*Id.* at p. 452.) Dillon became concerned that one of his friends might have been shot. (*Id.* at p. 482.) The boys heard someone coming behind them; Johnson appeared, carrying a shotgun. He shifted the shotgun's position and Dillon thought Johnson was preparing to shoot him. Dillon raised his rifle to his waist, pointed it in Johnson's direction, and began firing. He testified he fired without thinking, because he was afraid Johnson was going to shoot him. (*Id.* at pp. 482-483.) Johnson fell, and the boys fled. Johnson suffered nine bullet wounds and died several days later. (*Id.* at p. 452.)

Dillon was charged with felony murder-murder in the course of an attempted robbery. By statute, all felony murders were first degree murders, punishable by death or life in prison with or without the possibility of parole. (*Dillon, supra,* 34 Cal.3d at pp. 463, 466, 472, 477.) Dillon was tried as an adult. His expert witness, a clinical psychologist, testified Dillon was intellectually, socially, and emotionally immature for his age and, when confronted by Johnson, probably "'blocked out'" reality and "reacted reflexively," without thought. (*Id.* at p. 483.) The jury's questions to the court indicated the jurors were looking for a way to find Dillon guilty of second degree murder or manslaughter, but the jury instructions did not permit it if the killing occurred in the course of an attempted robbery. (*Id.* at p. 484.) After the jury was discharged, the foreman wrote a letter to the court expressing the jurors' unwillingness to return a verdict of felony murder, and asking that the court sentence Dillon to the California Youth Authority (CYA), rather than prison. (*Id.* at pp. 484-485.) The trial court did so, but the People challenged the commitment and the Court of Appeal held Dillon was statutorily ineligible as a matter of law for commitment to CYA. (*Id.* at p. 486.) The trial court then sentenced Dillon to life in prison with the possibility of parole. (*Id.* at p. 487.)

The court held that in the circumstances of the case, the punishment of Dillon by a sentence of life imprisonment for first degree murder violated the California Constitution's prohibition against cruel or unusual punishment. (*Dillon, supra,* 34 Cal.3d at p. 489.) It stated:

"[The record] shows that at the time of the events herein defendant was an unusually immature youth. He had had no prior trouble with the law, and ... was not the prototype of a hardened criminal who poses a grave threat to society. The shooting in this case was a response to a suddenly developing situation that defendant perceived as putting his life in immediate danger. To be sure, he largely brought the situation on himself, and with hindsight his response might appear unreasonable; but there is ample evidence that because of his immaturity he neither foresaw the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate." (*Dillon, supra,* 34 Cal.3d at p. 488.)

The court modified the judgment to reduce the degree of the crime to second degree murder. (*Dillon, supra,* 34 Cal.3d at p. 489.)

*Dillon* is distinguishable. Although both Dillon and defendant were young at the time of their offenses, in Dillon's case there was expert testimony that he was unusually immature; defendant presented no evidence about his degree of maturity. Dillon had no prior criminal record. Defendant was a gang member with a juvenile record of burglary and drug use.

Dillon went to Johnson's property to steal marijuana, not to shoot Johnson; although he went armed, the shooting was the result of his panicked reaction when he perceived that Johnson was about to shoot him. Johnson had previously threatened to shoot Dillon and his companions if they returned to his property; he was approaching Dillon with a shotgun in his hand at the time Dillon fired at him.

Defendant and his fellow gang members, in contrast, sought revenge against the persons who had shot at defendant's house. The individuals responsible were unknown; nonetheless, defendant and his companions planned to exact their revenge on whatever rival gang members they could find, whether they had any involvement in the earlier shooting or not. Salazar obtained a sawed-off shotgun at defendant's request; defendant borrowed a truck. Defendant then drove his companions multiple times past a house where a Halloween party was taking place, where they thought they recognized a few Nortenos. Salazar fired the shotgun at three people standing in front of the house. The shooting was unprovoked; it was not a panicked reaction to any perceived threat from the three victims. Defendant's gang affiliation, prior criminal history, and drug use, as well as the prior planning and the random, unprovoked nature of the shooting, all distinguish this case from *Dillon.*

In *Dillon,* the court also compared the sentence imposed on Dillon with that imposed on his companions. (*Dillon, supra,* 34 Cal.3d at p. 488.) The court noted that the others armed themselves, some with shotguns, and accompanied Dillon to the farm to steal marijuana; thus, they were coconspirators in the venture, or at least aiders and abettors and hence principals in the attempted robbery and the killing. Nonetheless, none of them was convicted of homicide or sentenced to state prison. They received probation, detention in a juvenile facility, or probation with a jail term. (*Ibid.*)

The probation report indicates Salazar has not been apprehended. Corona was sentenced to 13 years in prison after pleading no contest to permitting another to shoot from a vehicle (§ 12034, subd .(c)), with enhancements for great bodily injury and gang involvement (§§ 12022.7, subd. (a), 186.22, subd. (b)(1)). Delgadillo was sentenced to probation, with 364 days in jail, after pleading no contest to permitting another to shoot from a vehicle.

Delgadillo merely allowed defendant to use his truck. He was not present at the time of the shooting. The record does not indicate to what extent he was involved in planning the endeavor. Corona was in the truck when the shooting occurred and received a substantial sentence. Defendant, in addition to asking Salazar to acquire the shotgun and participating in the planning of the event, drove the truck past the house multiple times, until Salazar fired the shotgun at the partygoers. The sentences of the other participants do not demonstrate that defendant's punishment was grossly disproportionate to the crime.

Considering the nature and circumstances of the offenses and the personal characteristics of the defendant, we conclude that this is not one of those rare cases in which the penalty imposed was so grossly disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity.

(See Resp't's Answer Ex. B.)

A criminal sentence that is not proportionate to the crime for which a defendant is convicted may indeed violate the Eighth Amendment.  In Lockyer v.  Andrade, 538 U.S. 63 (2003), the Supreme Court discussed the current state of Eighth Amendment proportionality review and held that the only clearly established governing legal principle is that a "gross disproportionality" review

applies to criminal sentences for a term of years.  Id. at 72.  Citing extensively to its past cases

dealing with criminal sentencing and proportionality under the Eighth Amendment, the Court

acknowledged that it has "not established a clear and consistent path for courts to follow."  Id.  The

Supreme Court held that "the only relevant clearly established law amenable to the 'contrary to' or

'unreasonable application of' frame work is the gross disproportionality principle, the precise

contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case."  Id.[4]

In Ewing v. California, 538 U.S. 11 (2003), the Supreme Court again reviewed the Supreme

Court's Eighth Amendment jurisprudence, and chose to adopt Justice Kennedy's view[5] that:

> [There are] four principles of proportionality review-- the primacy of the legislature; the variety of legitimate penological schemes; the nature of our federal system; and, the requirement that proportionality be guided by objective factors– that inform the final one: The Eighth Amendment does not require strict proportionality between the crime and the sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.

Id. at 23.

In this case, the state court correctly applied clearly established Supreme Court precedent, and the state court's conclusions were objectively reasonable as Petitioner's sentence of 50 years was not grossly disproportionate to his multiple offenses.  As previously stated, Petitioner was convicted of one count of conspiracy to commit murder, two counts of mayhem, one count of permitting another to shoot from a vehicle, and three counts of assault with a firearm.  Petitioner was not merely the driver of a vehicle as he claims.  He desired to exact revenge by shooting at random members of a rival gang. He was heavily involved in planning and carrying out the offense.  He discussed with other members of his gang how the attack would take place.  He asked another member of his gang to obtain the firearm, which that member did.  He obtained a vehicle to be used in the attack.  He then located a party where it was believed rival members were in attendance and drove past it several times.  Then, he drove by slowly and his fellow gang member opened fire without provocation.

---

[4] The Court recognizes that other Supreme Court cases have dealt with cruel and unusual punishment.  See Solem v. Helm, 463 U.S. 277 (1983); Rummel v. Estelle, 445 U.S. 263, 276 (1980).  However, these cases analyze cruel and unusual punishment in the context of recidivist statutes.  In this case, Petitioner was sentenced for his current conviction.

[5] As expressed in his concurring opinion in Harmelin v. Michigan, 501 U.S. 957, 1001 (1991), citing Solem v. Helm, 463 U.S. 277, 288 (1983).

1   Ultimately, two random individuals were blinded and a third was shot in the shoulder area.

2          Additionally, his actions were not merely the result of a youthful indiscretion as he portrays.

3   Although he was just short of 19 years of age when he committed the crime, he had been involved in

4   gangs since the seventh grade.  He used alcohol and drugs from a young age.  He had previously

5   been placed on probation for burglary and being under the influence of a controlled substance.  He

6   violated his probation and was placed in a drug treatment program which he failed to complete.

7          Petitioner argues his sentence is grossly disproportionate when compared to the sentences

8   received by his codefendants.  As noted by Respondent, the Supreme Court has held that a defendant

9   cannot prove a constitutional violation simply by demonstrating that his sentence is disproportionate

10  to those received by other defendants similarly situated.  See Pulley v. Harris, 465 U.S. 37, 50-51

11  (1984).  Moreover, the shooter has never been apprehended, so there is no sentence to compare.  The

12  codefendant who received 364 days in jail and probation had pled no contest to merely allowing

13  Petitioner to borrow his truck. There was no evidence that he was involved in planning or carrying

14  out the offense.  The codefendant who received a substantial sentence of 13 years, though not as

15  severe as Petitioner's, was in the vehicle when the offense occurred.  His actions were not as

16  egregious as the shooter's or Petitioner's.  Therefore, even if a constitutional violation could be made

17  by demonstrating disproportionate sentences among codefendants, which one cannot, no such

18  disproportionality exists in this case.

19         Therefore, it is clear that Petitioner has failed to demonstrate that the state court's decision

20  was "contrary to, or involved an unreasonable application of, clearly established Federal law."

21  Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). The claim should be denied.

22                                        **RECOMMENDATION**

23         Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH

24  PREJUDICE.

25         This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

26  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of

27  the Local Rules of Practice for the United States District Court, Eastern District of California.

28  Within thirty (30) days after service of the Findings and Recommendation, any party may file written

1   objections with the court and serve a copy on all parties.  Such a document should be captioned

2   "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall

3   be served and filed within fourteen (14) days after service of the objections.  The Court will then

4   review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised

5   that failure to file objections within the specified time may waive the right to appeal the District

6   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

7

8   IT IS SO ORDERED.

9   **Dated:    March 25, 2011**                    **/s/ Sandra M. Snyder**
                                      UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28